**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 1:25-cv-01213-RP<br><br>ORAL ARGUMENT REQUESTED |

# DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

## TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ........................................................ 1
BACKGROUND ........................................................ 3
LEGAL STANDARD ........................................................ 5
ARGUMENT ........................................................ 5
I. PLAINTIFFS FAIL TO PLEAD A MISREPRESENTATION OR OMISSION ............... 5
    A. Tesla Disclosed The Risks Related To FSD ........................................................ 5
    B. The Capability Statements Were Not Materially False ........................................................ 8
    C. The Safety Statement Was Not Materially False ........................................................ 17
    D. The Austin Launch Statements Were Not Materially False ........................................................ 18
II. PLAINTIFFS DO NOT PLEAD A STRONG INFERENCE OF SCIENTER ................. 19
    A. The Allegations Regarding Musk's Pay Package Undermine Scienter ................. 20
    B. Plaintiffs Fail To Plead Knowledge Of Falsity Or Deliberate Recklessness ......... 21
    C. The More Compelling Inference Is Genuine Optimism ........................................................ 26
III. PLAINTIFFS DO NOT ADEQUATELY ALLEGE LOSS CAUSATION ..................... 27
    A. The China Update Did Not Reveal Any Prior Statements Were False ................. 28
    B. The Austin Launch Did Not Reveal Falsity Of Any Prior Statements And Is Not Plausibly Alleged To Have Caused Share Price Declines .......................... 29
IV. PLAINTIFFS FAIL TO PLEAD CONTROL PERSON LIABILITY .............................. 30
CONCLUSION ........................................................ 30

## TABLE OF AUTHORITIES

**Page**

### Cases

*Abrams v. Baker Hughes Inc.*,
292 F.3d 424 (5th Cir. 2002) ....12, 21, 22, 23

*Alaska Elec. Pension Fund v. Flotek Indus., Inc.*,
915 F.3d 975 (5th Cir. 2019) ....19

*Braun v. Eagle Rock Energy Partners, L.P.*,
223 F. Supp. 3d 644 (S.D. Tex. 2016) ....14

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016) ....14, 17

*Catogas v. Cyberonics, Inc.*,
292 F. App'x 311 (5th Cir. 2008) ....27, 30

*In re Cornell Companies, Inc. Sec. Litig.*,
2005 WL 8165685 (S.D. Tex. Mar. 31, 2005) ....20

*In re CrowdStrike*,
2026 WL 89682 (W.D. Tex. Jan. 12, 2026) .... *passim*

*In re Dell Inc. Sec. Litig.*,
591 F. Supp. 2d 877 (W.D. Tex. 2008) ....22, 23, 28, 29, 30, 31

*Dura Pharms, Inc. v. Broudo*,
544 U.S. 336 (2005) ....28

*Edgar v. Anadarko Petroleum Corp.*,
2018 WL 3032573 (S.D. Tex. June 19, 2018) ....15

*In re FVC.COM Sec. Litig.*,
32 F. App'x 338 (9th Cir. 2002) ....22

*Ginsberg Crutchfield v. Match Grp., Inc.*,
529 F. Supp. 3d 570 (N.D. Tex. 2021) ....26

*Heinze v. Tesco Corp.*,
971 F.3d 475 (5th Cir. 2020) ....13

*Hopson v. MetroPCS Commc'ns, Inc.*,
2011 WL 1119727 (N.D. Tex. Mar. 25, 2011) ....19

*In re Intel Corp. Sec. Litig.*,
2023 WL 2767779 (N.D. Cal. Mar. 31, 2023) .......... 21, 26, 27

*Jacobowitz v. Range Res. Corp.*,
596 F. Supp. 3d 659 (N.D. Tex. 2022) .......... 12

*Kurtzman v. Compaq Computer Corp.*,
2000 WL 34292632 (S.D. Tex. Dec. 12, 2000) .......... 14, 15

*LaMontagne v. Tesla, Inc.*,
2024 WL 4353010 (N.D. Cal. Sept. 30, 2024), *aff'd*, *Oakland County Voluntary Emps.' Beneficiary Ass'n v. Tesla, Inc.*,
2025 WL 3459471 (9th Cir. Dec. 2, 2025) .......... *passim*

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
667 F.3d 1331 (10th Cir. 2012) .......... 20

*Ludlow v. BP, P.L.C.*,
800 F.3d 674 (5th Cir. 2015) .......... 29

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) .......... 30

*Milano v. Perot Sys. Corp.*,
2006 WL 929325 (N.D. Tex. Mar. 31, 2006) .......... 17

*Neiman v. Bulmahn*,
854 F.3d 741 (5th Cir. 2017) .......... 25

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
423 F. Supp. 2d 364 (S.D.N.Y. 2006) .......... 10

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) .......... 15, 16, 17, 18

*Owens v. Jastrow*,
789 F.3d 529 (5th Cir. 2015) .......... 5, 22, 25, 27

*R2 Invs. LDC v. Phillips*,
401 F.3d 638 (5th Cir. 2005) .......... 19

*Reckstin Fam. Tr. v. C3.ai, Inc.*,
718 F. Supp. 3d 949 (N.D. Cal. 2024) .......... 22

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003) .......... 19, 27

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
365 F.3d 353 (5th Cir. 2004) ....................13, 22, 25, 30

*Spitzberg v. Houston Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) ....................5

*In re Splash Tech.*,
2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) ....................17

*Tellabs Inc. v. Makor Issues & Rights Ltd.*,
551 U.S. 308 (2007)....................5, 19, 26

*Tran v. XBiotech Inc.*,
2016 WL 5408382 (W.D. Tex. Sep. 23, 2016)....................23

*In re Wet Seal, Inc. Sec. Litig.*,
518 F. Supp. 2d 1148 (C.D. Cal. 2007) ....................27

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ....................14, 16, 24

**Statutes and Rules**

15 U.S.C. § 78u-4(b)(1) ....................5, 9

15 U.S.C. § 78u-5(i)(1) ....................13

Fed. R. Civ. P. 9(b) ....................5

Rule 10b-5....................1

Defendants respectfully submit this motion to dismiss the Amended Complaint (ECF No. 18, "Complaint") and brief in support.

## PRELIMINARY STATEMENT

This action is a meritless attempt to convert Tesla's forward-looking and accurate optimism about its driver-assistance and autonomous driving technology into federal securities fraud. The Complaint falters at every element required to state a claim under Section 10(b) and Rule 10b-5. It identifies no actionable misrepresentation, pleads no plausible—let alone cogent and compelling—inference of scienter, and fails to connect the alleged statements to investor losses. Worse still, it recycles a theory already rejected by federal courts, including the Ninth Circuit Court of Appeals, in nearly identical litigation concerning the very same technology. For the reasons below, this Court should dismiss the action with prejudice.

***First***, the Complaint fails to plead a single materially misleading statement. Plaintiffs do not—and cannot—challenge the accuracy of Tesla's SEC filings during the Class Period. Instead, they target statements made in earnings calls, interviews, product launches, and social media posts. These statements were not false when made and are (1) expressly forward-looking and shielded by the PSLRA's Safe Harbor, (2) accompanied by robust cautionary language, or (3) inactionable expressions of corporate optimism or belief. Every challenged statement was tempered with warnings that Full Self-Driving ("FSD")[1] technology "may take longer than expected" and that there was "no guarantee" it would "perform as forecast in the timeframe we anticipate, or at all." Defendants repeatedly disclosed the very facts and risks Plaintiffs now claim were concealed.

---

[1] Depending on timeframe, the technology at issue in this lawsuit has been called "Full Self-Driving (Beta)," "Full Self-Driving Capability," or "Full Self-Driving (Supervised)." Although these phrases differ, the Complaint deploys the shorthand "FSD." For ease, Tesla adopts that nomenclature here but includes the full name where necessary to identify the specific suite of features applicable during a given timeframe.

***Second***, Plaintiffs fail to allege any inference of scienter, let alone one that is cogent and compelling as required under the Private Securities Litigation Reform Act ("PSLRA"). Plaintiffs offer no particularized facts showing that Defendants knowingly misled investors or possessed information contradicting their public statements. The inference of genuine optimism—bolstered by Tesla's detailed risk disclosures and Defendants' retention of stock throughout the Class Period—is far more compelling than any speculative claim of fraud. Plaintiffs' reliance on Musk's 2025 performance award backfires: The award's structure, tied to objective milestones, aligns Musk's interests with shareholders and disproves any motive to misrepresent progress. Vague allegations attributed to former employees—whom Plaintiffs do not allege communicated any concerns to any Defendant—cannot overcome the absence of any motive to defraud, particularly in light of the more compelling non-culpable inference of good-faith optimism.

***Finally***, Plaintiffs fail to adequately allege loss causation. Neither of the purported "corrective disclosures"—Tesla's FSD rollout in China or the Austin Robotaxi launch—revealed falsity in prior statements. At most, these events reflected the materialization of risks Tesla had already specifically warned of. Tellingly, Tesla's stock price *rose* after the Austin launch and fell only later due to unrelated market news. This fatal disconnect between the alleged misstatements and investor losses underscores the Complaint's infirmity.

These pleading failures mirror those that resulted in dismissal of nearly identical allegations about the same technology in *LaMontagne v. Tesla, Inc.*, 2024 WL 4353010 (N.D. Cal. Sept. 30, 2024), *aff'd*, *Oakland County Voluntary Emps.' Beneficiary Ass'n v. Tesla, Inc.*, 2025 WL 3459471 (9th Cir. Dec. 2, 2025), where the Ninth Circuit held that "Plaintiffs ha[d] failed to allege that Musk did not honestly believe reaching full autonomy was possible on his suggested timeline." *Id.* at *1. The same pleading failures—and others—warrant dismissal of this action.

## BACKGROUND

Tesla is a cutting-edge, vertically integrated company that manufactures and sells electric vehicles, as well as energy generation and storage devices, and is "increasingly focused on … artificial intelligence, robotics and automation." ¶ 30; Ex. 1 (2023 10-K) at 33.[2] For years, Tesla has been developing advanced driver-assistance technology, including Autopilot and FSD features. ¶¶ 32-34. Tesla has been explicit throughout the Class Period that "active driver supervision [is] required" for FSD and that these features did "not make the vehicle autonomous." ¶ 38; *see* Ex. 1 at 5; Ex. 2 (2022 10-K) at 5; Ex. 3 (2024 10-K) at 3.[3]

Leading up to and throughout the Class Period, Tesla continued to develop its FSD technology, pursuing fully autonomous capabilities, and disclosed successes, risks, setbacks, and the future outlook along the way. ¶¶ 36-37. Musk and Tesla were optimistic regarding the development of these features but cautioned investors that "certain features of our vehicles such as new Autopilot or FSD features may take longer than expected to become enabled." Ex. 1 at 18; *see also* Ex. 2 at 18; Ex. 3 at 17. Tesla cautioned further that "[t]here is no guarantee that we will be able to successfully and timely introduce and scale … such processes or features" and that Tesla may experience "delays in launching and/or ramping production of … future features and services based on artificial intelligence." Ex. 1 at 14-15; *see also* Ex. 2 at 14-15; Ex. 3 at 13-14. Tesla also informed investors that "there may be latent defects" in its software and that efforts to remedy those issues "may not be timely, may hamper production or may not completely satisfy our customers." Ex. 1 at 18; Ex. 3 at 17; *see also* Ex. 2 at 18 (similar, emphasizing "inherently complex" technology).

---

[2] References to "¶ __" are to the Complaint. All emphasis is added and internal quotations and citations omitted unless otherwise noted. Exhibits are to the Declaration of John Bash.

[3] *See also* Ex. 4 (Q1 2024 Presentation) at 3; Ex. 5 (Q4 2024 Presentation) at 3.

Tesla disclosed additional potential challenges and work still to be done, including as to its hardware. Tesla equipped vehicles with its Hardware 3 ("HW3") computer starting in 2019, then began transitioning to the more powerful Hardware 4 ("HW4") in January 2023. ¶¶ 131-32. Tesla expected HW3 to be capable of fully autonomous operations but later transparently disclosed to investors that they were "starting with Hardware 4 and figuring out the solution and back-porting it to Hardware 3 instead of directly working on Hardware 3 given that Hardware 4 has more like fundamental hardware capabilities." ¶ 413. Tesla acknowledged "***we're not 100% sure … there is some chance that H[W]3 does not achieve the safety level that allows for unsupervised FSD.***" Ex. 6 (Q3 2024 Earnings Call) at 16. And Plaintiffs themselves allege that in Q4 2024 Musk disclosed the risk of HW3 "limitations." ¶ 310; *see also* Ex. 7 (Q4 2024 Earnings Call) at 10.

Tesla made significant progress developing FSD throughout the Class Period—improving FSD with each software version (¶¶ 286-87; Ex. 8 (May 5, 2025 Piper Sandler Report) at 1), achieving a 100x improvement in miles between critical interventions (¶¶ 295-96) and the "impressive" "result[]" of 54% better than human safety for Full Self-Driving (Supervised) prior to the Austin launch (Ex. 9 (June 11, 2025 Guggenheim Report) at 21), and launching driverless Robotaxis in Austin, Texas. That development—like virtually all cutting-edge technologies—was not without challenges, which Tesla disclosed in real time. For example, users reported growing pains when certain FSD features were first introduced in China in February 2025 (¶¶ 446-48), and Plaintiffs allege Tesla's Austin Robotaxi launch in June 2025—despite being widely praised by analysts (¶ 456)—was purportedly accompanied by isolated issues, common to any first-of-its-kind deployment (¶¶ 452-56). Despite these challenges, Tesla's shareholders benefitted from Tesla's advancing technology: Tesla's share price nearly doubled over the Class Period. *See* Ex. 10 (Tesla Stock Price History) at 1-2.

## LEGAL STANDARD

To state a claim, Plaintiffs must allege particularized facts showing (1) a misrepresentation or omission of a material fact; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015). Claims under Section 10(b) are subject to the heightened pleading requirements of Rule 9(b) and the PSLRA, which require Plaintiffs to identify each allegedly misleading statement with particularity, explain why it is misleading, and plead facts giving rise to a "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(1)-(2); *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 683 (5th Cir. 2014). Plaintiffs fail to meet this "exacting" standard. *Tellabs Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 313 (2007).

## ARGUMENT

### I. PLAINTIFFS FAIL TO PLEAD A MISREPRESENTATION OR OMISSION

Plaintiffs allege that three categories of statements by Defendants during the Class Period were false or misleading: (i) eighteen statements regarding FSD capabilities (the "Capability Statements"); (ii) one statement regarding the relative safety of FSD (the "Safety Statement"); and (iii) seven statements regarding the Robotaxi launch in Austin, Texas (the "Austin Launch Statements").[4] But Plaintiffs fail to show any challenged statement was inaccurate. And Tesla repeatedly and extensively disclosed the precise details and caveats Plaintiffs contend were concealed. Further, the alleged misstatements are a combination of forward-looking statements protected by the PSLRA Safe Harbor and inactionable corporate optimism and opinions.

#### A. Tesla Disclosed The Risks Related To FSD

Plaintiffs' fraud theory fails out of the gate because Tesla "precisely address[ed] the alleged

[4] Five of the Austin Launch Statements are also Capability Statements. *See* App A.

misrepresentations" by warning of the very risks Plaintiffs claim were concealed—including "potential delays and complications in developing the technology" and that "certain features such as autopilot and FSD may take longer than expected." *LaMontagne*, 2024 WL 4353010, at *8. Plaintiffs allege Defendants misled investors about (1) Tesla's "Vision-Only" approach; (2) FSD's timeline and capabilities; (3) FSD's safety; (4) whether HW3 could achieve full autonomy; and (5) what SAE Levels Tesla's FSD technology was capable of achieving. ¶¶ 399-441. But Tesla disclosed these risks repeatedly and specifically in a manner that "adequately warned investors of exactly the risks Plaintiffs contend were not disclosed," which forecloses Plaintiffs' fraud claims. *In re CrowdStrike*, 2026 WL 89682, at *13 (W.D. Tex. Jan. 12, 2026).

***First***, Plaintiffs allege that statements regarding Tesla's "Vision-Only" approach (using cameras rather than lasers, referred to as "LiDAR") were misleading because Tesla's vehicles "lacked redundant sensors necessary for SAE Level 3+," and Tesla concealed that its technology trained with LiDAR-equipped Ground Truth Machines ("GTMs"). *E.g.*, ¶¶ 400, 403. But Tesla repeatedly disclosed both why it preferred its unique Vision-Only strategy and the potential risk that it may not succeed. *E.g.*, Ex. 11 (Q1 2021 10-Q) at 45 ("we are developing self-driving and driver assist technologies to rely on vision-based sensors" and "[t]here is no guarantee" the equipment "will perform as expected in the timeframe we anticipate, *or at all*."); Ex. 12 (2022 Tesla Blog Post). The market understood these risks. *E.g.*, Ex. 9 at 2 (Vision-Only "can win longer-term" but faces "limitations today"). And it was no secret during the Class Period that Tesla validated its FSD capabilities with LiDAR GTMs. *E.g.*, Ex. 13 (Lidar News, Aug. 19, 2022); Ex. 14 (Electrek, Nov. 2, 2016).

***Second***, Plaintiffs challenge Defendants' statements regarding the timeline for rollout of FSD features—for example, that Tesla "expect[s] actually to start fully autonomous unsupervised

FSD in Texas and California next year." ¶ 407. But Tesla warned extensively that FSD may not achieve the projected capabilities on the anticipated timeline (*see supra* at 3), including that "there may be latent defects" in its software and that efforts to remedy those issues "may not be timely, may hamper production or may not completely satisfy our customers." Ex. 1 at 18; Ex. 3 at 17; *see* Ex. 2 at 18 (similar).

***Third***, Plaintiffs complain of purportedly undisclosed safety risks, alleging that Tesla's vehicles sometimes committed traffic violations, including during its China rollout. *E.g.*, ¶¶ 406, 428. Yet Tesla never claimed that FSD was (or ever would be) free from error, only that it "*can be* so much better than a person." ¶ 407. At the same time, Tesla consistently warned of safety risks, as well as corresponding risks of regulatory scrutiny. Ex. 3 at 18, 21 (Tesla "vehicles have been involved and we expect … will be involved in accidents resulting in death or personal injury, and such accidents where Autopilot … or FSD (Supervised) features are engaged are the subject of significant public attention" and that "hardware and software-related safety concerns" had prompted recalls and regulatory investigations); Ex. 1 at 19, 22; Ex. 2 at 18, 22. And as the China update and Austin Robotaxi launch approached, Tesla cautioned the market specifically about the risks of those events and the difficulties of local traffic laws. *E.g.*, Ex. 7 at 12 (noting regulatory "quandary" with exporting training data from China and that "bus lanes in China are one of our biggest challenges in making FSD work in China [as] their bus lanes are very complicated"); Ex. 15 (Q1 2025 Earnings Call) at 17-18 (noting "reliability issues" in advance of Austin launch).

***Fourth***, Plaintiffs allege Defendants misled investors by projecting that HW3 could achieve full autonomy (¶ 399), when in reality, such vehicles would need hardware updates (¶¶ 400, 408, 410, 412). But Tesla warned investors "there is no guarantee" that Tesla's "specific software or equipment … will perform as forecast in the timeframe we anticipate, or at all." Ex. 3

at 16-17; Ex. 1 at 18; Ex. 2 at 18. As Tesla continued to develop FSD, it explicitly disclosed that "Hardware 4 has really several times the capability of Hardware 3 … it takes a lot of effort to sort of squeeze that functionality into Hardware 3." Ex. 6 at 16. Tesla acknowledged that, as a result of the hardware capability differences, "***we're not 100% sure … there is some chance that H[W]3 does not achieve the safety level that allows for unsupervised FSD***" and that "***we don't actually know***" whether hardware upgrades will be needed. *Id.* And as Plaintiffs themselves allege, Musk disclosed the risks of HW3 "limitations." ¶ 310.[5] These disclosures were made before any purported corrective disclosure.

***Finally***, Plaintiffs allege certain statements were misleading because Tesla's FSD capabilities were "Level 2," meaning they required active driver supervision. *E.g.*, ¶¶ 403, 408, 412, 440. But each of Tesla's Form 10-Ks during the Class Period stated that Full Self-Driving (Supervised) "currently require[s] drivers to *remain fully engaged in the driving operation*"—*i.e.*, that it was a Level 2 system. Ex. 3 at 24; *id.* at 3; Ex. 1 at 25; Ex. 2 at 25. And Tesla's consumer-facing materials stated plainly: "Currently enabled features require active driver supervision and *do not make the vehicle autonomous*." ¶ 56. In any event, it was public no later than 2021 that Tesla's FSD capabilities were rooted in Level 2 capabilities. Ex. 16 (Forbes, Mar. 13, 2021). Investors knew supervision was required. Ex. 9 at 12 (contrasting Full Self-Driving (Supervised) to fully autonomous as "apples vs. oranges").

### B. The Capability Statements Were Not Materially False

Even if Defendants had not disclosed the very risks Plaintiffs claim were concealed,

---

[5] On the same earnings call cited in the Complaint, Taneja similarly noted uncertainty regarding HW3, as they were "still working on it." ¶ 311. Plaintiffs characterize Taneja's statement as an "attempt[] to soften" Musk's statement regarding HW3 "limitations" (¶¶ 310-11), but that is plainly incorrect, as Taneja made his statement *prior* to Musk's. *See* Ex. 7 at 10.

Plaintiffs do not allege *why* any of the Capability Statements[6] were false when made. They were not. And in any event, they are forward-looking statements protected by the PSLRA Safe Harbor and Bespeaks Caution Doctrine and inactionable statements of opinion or corporate optimism.

1. <u>The Capability Statements Were Not False When Made</u>

Plaintiffs fail to plead "reasons why" the Capability Statements were false or misleading. 15 U.S.C. § 78u-4(b)(1).

***First***, Plaintiffs assert that certain Capability Statements must have been false because they allege the vehicles sometimes had issues similar to human drivers or purportedly committed traffic violations, including during the China launch. Statements #3, 8, 10-11, 15-20. But any alleged errors or issues—such as a "left turn gone wrong" (¶ 453)—do not render false general statements about FSD capabilities because Tesla never claimed that FSD operated perfectly 100% of the time or without human-like errors. *CrowdStrike*, 2026 WL 89682, at *13, 15 & n.19 (finding software errors did not render prior statements false or misleading where CrowdStrike made "no guarantee of [software] being implemented perfectly, and [] disclosed [key risks]").[7] And to the extent Plaintiffs' allegations of falsity hinge on purported errors during the China launch, that launch did not entail fully autonomous technology, or even the full suite of Full Self-Driving (Supervised) features—it was instead a "Navigate on Autopilot" update. ¶ 445.[8] And all it supposedly revealed was challenges with "restricted lanes" arising from differing street signage and traffic rules—exactly as Musk warned of weeks prior (*supra* at 7). *See, e.g.*, *In re Nokia Oyj (Nokia Corp.) Sec.*

---

[6] #1-8, 10-13, 15-20. "#__" refers to statement numbers in Appendix A.

[7] Plaintiffs' allegations regarding the "Tesla Files"—which contained information about pre-Class Period testing of "Autopilot between 2015 and 2022"—are likewise insufficient, as no one would expect vehicles to work perfectly—nor did Tesla ever represent they always worked perfectly—and the files were widely reported on two years prior to any alleged corrective disclosure. ¶¶ 378-86.

[8] *See also* Ex. 17 (Q2 2024 Earnings Call) at 12 (Musk noting that "self-driving capabilities [] deployed outside of North America are far behind that in North America").

*Litig.*, 423 F. Supp. 2d 364, 405 (S.D.N.Y. 2006) (it "was well within reason to have an optimistic outlook about its new products" when company was attempting to fix its technological problems).

***Second***, Plaintiffs allege the Capability Statements were false or misleading because Full Self-Driving (Supervised) is an SAE Level 2 feature—requiring continuous human oversight. *E.g.*, ¶¶ 403 (#2), 406 (#3), 416 (#8), 422 (#11), 426 (#13). But each of Tesla's Form 10-Ks during the Class Period stated that Full Self-Driving (Supervised) "currently require[s] drivers to *remain fully engaged in the driving operation*" (*supra* at 8), rendering these statements not misleading "[w]hen read in context," *CrowdStrike*, 2026 WL 89682, at *8. Further, that Full Self-Driving (Supervised) is SAE Level 2 says nothing about Tesla's ability to achieve higher-level autonomy based on rapid improvements, nor do isolated FE accounts of similar issues to human drivers (*see infra* at 24) negate that documented progress.[9] And, ultimately, ***the June 2025 Austin Robotaxi launch was of SAE Level 4 features***, ***by Plaintiffs' own allegations***. ¶ 452 (Austin launch "driverless"); *see also* Ex. 18 (SAE Levels Chart) ("local driverless taxi" is Level 4 feature). Plaintiffs' bare assertion that Tesla could not exceed SAE Level 2 thus fails and in any event does not render any statement misleading in the context of information available to investors.

***Third***, Plaintiffs allege Tesla's unique "Vision-Only" approach—the benefits and risks of which Tesla repeatedly disclosed and the market well-understood (*see supra* at 6)—rendered the Capability Statements misleading, apparently based on the plainly false assertion that Vision-Only software could never achieve autonomous driving. *E.g.*, ¶ 440. Critically, Plaintiffs do not allege—because they cannot—that achieving Level 3+ in fact ***requires use of radar or LiDAR***.

---

[9] *See, e.g.*, Ex. 9 at 21 (Full Self-Driving (Supervised) "is now 54% safer than a human when engaged" and "the results are impressive given TSLA was targeting human level safety sometime prior to Austin launch"); Ex. 8 at 1 (noting "[m]iles to disengagement jumped 2x between v12 and v13; improvement is clearly evident" and "[o]n a 3-year timeline, improvement is even clearer (v13 has improved +8x vs. v10)").

Plaintiffs conveniently ignore that the Austin Robotaxi launch (and ongoing Robotaxi operations in Austin, none of which use LiDAR) are of SAE ***Level 4*** features, by their own allegations. *See supra* at 10.[10] Plaintiffs' only argument is that FE-1 purportedly does not believe full autonomy is possible without redundancies. ¶¶ 346-57.[11] But FE-1 is not plausibly alleged to have *any* pertinent information regarding the Class Period: He left Tesla in 2022, after serving in Europe in a "data-related role." ¶ 346. His opinion fails to establish the falsity of statements that Vision-Only "can achieve self-driving" (#2) or was "generalized" rather than requiring "neighborhood-by-neighborhood" mapping (#11).[12]

***Fourth***, Plaintiffs allege the Capability Statements were misleading because HW3 vehicles need hardware upgrades to achieve fully autonomous FSD. *E.g.*, ¶¶ 400, 408. But Tesla repeatedly warned that upgrades to HW3 may be required. *Supra* at 4, 8. Thus, "no reasonable investor" could have found these statements misleading "[w]hen read in context." *CrowdStrike*, 2026 WL 89682, at *8.

***Fifth***, Plaintiffs assert Tesla's supposed "no-intervention policy" rendered statements about Tesla's intervention rate false because the rate allegedly would have been higher absent this

[10] Indeed, Plaintiffs' assertion that "to date" all L3+ systems have utilized LiDAR or other redundant sensors (¶ 61) ignores extensive public reporting about Tesla's driverless Robotaxi operations in the weeks prior to the filing of the Amended Complaint. *See, e.g.*, Ex. 19 (Yahoo! Finance, Jan. 23, 2026) ("TSLA has reached a major milestone in autonomous driving by launching robotaxi rides in Austin, TX, with no human safety monitor inside the vehicle.").

[11] Notably, at no point does the Complaint allege FE-1—or any other FE—believed LiDAR was necessary to achieve higher SAE Levels, let alone that any Defendant shared that view (*infra* at 23-24). To the contrary, allegations attributed to FE-1 predominantly concern removal of a secondary steering chip for some cars in "late 2021-2022" (¶¶ 347, 350-53, 524)—which was widely reported over a year prior to the Class Period as a temporary measure merely to "deal with chip shortages." Ex. 20 (CNBC, Feb. 7, 2022).

[12] FE allegations that Tesla used LiDAR data for training purposes "retrospectively" and "in the past tense" do not establish falsity of any Capability Statements. ¶ 361 (FE2); *see also* ¶¶ 367, 369 (FEs 4 and 5). Tesla vehicles did not use LiDAR "in real-time operation." ¶ 361.

policy. ¶¶ 433, 437. But Plaintiffs do not allege that *but for* the policy, interventions would not have been "very rare" as Tesla disclosed (#17). *See Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 433 (5th Cir. 2002). Nor do they plead the purported "policy" itself with the particularity required by the PSLRA. Plaintiffs rely on FE-2, who merely alleges safety monitors in "later" stage testing were told to "let it play out" rather than intervening "at their discretion" (¶ 544). The Complaint does not identify *who* gave this instruction, *when* and *how* it was communicated, or to *whom*.

***Sixth***, Plaintiffs challenge Musk's repost of a video showing Tesla vehicles driving in Austin in FSD mode, which he captioned "[t]hese are unmodified Tesla cars … every Tesla coming out of our factories is capable of unsupervised self-driving" (#20). But Plaintiffs do not allege the vehicles were not, in fact, operating in FSD mode. Instead, Plaintiffs allege this statement was misleading because the Austin launch was geofenced, and the vehicles were modified with a safety kill switch. ¶ 454. But the market was aware of the geofencing used during the launch itself,[13] and Plaintiffs do not allege the vehicles depicted in the video reposted by Musk were modified in any way, particularly considering the video predated the launch by several weeks. This problem is pervasive throughout the Complaint, which fails to adequately allege why any specific statement was false. *See, e.g.*, *Jacobowitz v. Range Res. Corp.*, 596 F. Supp. 3d 659, 674-75 (N.D. Tex. 2022) (dismissing claims for which reasons for falsity were not alleged with particularity).

***Finally***, Plaintiffs simply take many of the Capability Statements out of context. For example, Plaintiffs challenge Musk's January 29, 2025 statement that Tesla's "current constraint is battery packs" (#8), claiming that there were other constraints to FSD development (¶ 416). But Musk's statement addressed current constraints to "*growing our annual volumes*"—not constraints

---

[13] *E.g.*, Ex. 9 at 1 (in interviews following Q1 2025 earnings call, "CEO Musk has indicated the robotaxi will operate in a geofenced area to maximize safety").

on FSD development—and Plaintiffs do not allege battery packs *were not* the main volume constraint. ¶ 416; *cf.* Ex. 21 (Jan. 30, 2025 Wolfe Research) at 1 ("2025 is setting up to be a difficult year, with … battery supply constraints."). Because the statement says nothing about constraints to FSD development as opposed to production volume, it is not misleading. *Heinze v. Tesco Corp.*, 971 F.3d 475, 483 (5th Cir. 2020) ("[P]ure-omission claims are not cognizable.").

2. <u>The Capability Statements Were Forward-Looking And Accompanied By Cautionary Language</u>

The PSLRA Safe Harbor protects forward-looking statements that are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially," or not made with "actual knowledge" that they were "false or misleading." 15 U.S.C. § 78u-5(c)(1)(A)-(B). Both prongs protect several of the Capability Statements. *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 371 (5th Cir. 2004).

Twelve of the eighteen Capability Statements[14] are projections protected by the PSLRA—they speak to what Tesla's technology is *expected* to do. For example, Musk told investors "we believe [HW3 vehicles] will achieve full autonomy" (#1) and that "we only have a big existing fleet which hopefully, with the software update could become autonomous" (#16).[15] These are precisely the kind of "plans or objectives relating to [Tesla's] products or services" that the PSLRA defines as forward-looking. 15 U.S.C. § 78u-5(i)(1)(B); *Southland*, 365 F.3d at 371; *LaMontagne*, 2024 WL 4353010, at *6 (statement that "we expect to be feature complete with autonomy by the

[14] Statements #1, 2, 4, 7, 10, 12, 13, 15, 16, 18, 19, 20.

[15] Other Capability Statements are likewise forward-looking. *See* #2 ("our solution ... can achieve self-driving"); #7 ("There is some chance that Hardware 3 ... does not achieve the safety level that allows for unsupervised FSD"); #12 ("Once we can make the whole system work ... that is a very scalable thing"); #13 ("once we make it work in a few cities, we can basically make it work in all cities in that legal jurisdiction"). Notably, the Complaint's framing of #12 omits Musk's introductory qualifier, just sentences prior: "Now let me walk you through why I'm so excited about the future of Tesla." Ex. 15 at 17.

end of this year" was "plainly forward-looking"); *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1191–92 (9th Cir. 2021) (Tesla's statements that it was "on track" to hit production targets "fall solidly within the category of forward-looking statements").

Each earnings call opened with robust warnings that the call would "make forward-looking statements" and that "[a]ctual events or results could differ materially due to a number of risks and uncertainties," directing investors to risk disclosures in Tesla's SEC filings.[16] Those SEC filings, in turn, warned specifically of the risks Plaintiffs now claim were concealed. *See supra* at 6-8. Indeed, while cautionary language "need not identify what actually goes wrong and causes projections to be inaccurate," ***Tesla did just that***. *LaMontagne*, 2024 WL 4353010, at *7–8; *see Carlton v. Cannon*, 184 F. Supp. 3d 428, 463-64 (S.D. Tex. 2016) (finding similar language, such as that the company's technology "may not perform as expected," to be sufficiently "company-specific" and "tailored" as to constitute meaningful cautionary language).

The Capability Statements made at events are similarly protected under the Bespeaks Caution Doctrine. *E.g.*, #4 (Tesla "will achieve unsupervised full self-driving with permission in [] wherever regulators essentially approve it"). Under the doctrine, forward-looking statements are not actionable where "the total mix of information" available to investors included sufficient cautionary language to render them not misleading. *Kurtzman v. Compaq Computer Corp.*, 2000 WL 34292632, at *32 (S.D. Tex. Dec. 12, 2000); *see Braun v. Eagle Rock Energy Partners, L.P.*, 223 F. Supp. 3d 644, 653-54 (S.D. Tex. 2016). Here, the total mix included Tesla's risk factors set forth in its Forms 10-K, which warned specifically of delays and issues with the development of FSD capabilities. *See supra* at 3, 7-8.

---

[16] Ex. 22 (Q1 2023 Earnings Call) at 2; Ex. 23 (Q1 2024 Earnings Call) at 2; Ex. 17 at 2; Ex. 6 at 2; Ex. 7 at 2; Ex. 15 at 2.

3. <u>The Capability Statements Include Inactionable Statements Of Opinion</u>

Several of the Capability Statements[17] are not just forward-looking—they are statements of opinion, actionable where Plaintiffs adequately allege the speaker did not honestly hold the expressed belief. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015); *Edgar v. Anadarko Petroleum Corp.*, 2018 WL 3032573, at *10 (S.D. Tex. June 19, 2018) (generalized allegations of failure to disclose "some fact cutting the other way" or "the basis for [speaker's] opinion" are insufficient). For example, Musk told investors "***we believe*** [HW3 vehicles] will achieve full autonomy," adding that his prediction was "to the best of my knowledge" (#1).[18] Courts routinely treat the type of language that permeates these statements as indicators of opinion. *See Oakland County*, 2025 WL 3459471, at *1 (holding substantially similar statements re Tesla FSD capabilities were "clearly opinions"); *Kurtzman*, 2000 WL 34292632, at *8 ("expects" language "conveys opinion and hope, and thus a potential of nonrealization").

Plaintiffs do not plead facts demonstrating the Capability Statements were not honestly held. Instead, Plaintiffs point to differing views regarding Tesla's Vision-Only approach, allegations of FSD making similar errors as human drivers, and already-public information. These allegations do not render the statements misleading as an objective matter (*see supra* at 9-13)—let alone render Defendants' subjective opinions actionable. Plaintiffs also again ignore that ***Tesla has Robotaxis in operation in Austin*** (*see supra* at 11), demonstrating that Defendants' opinions regarding full autonomy were objectively true, in addition to being subjectively held.

---

[17] Statements # 1, 2, 3, 7, 11, 13, 15, 16, 18, 19.

[18] Other Capability Statements are likewise statements of opinion. *See* #2 ("I *think* we just need to — it just needs to be obvious that our approach is the right approach. And I *think* it is. I *think* we've now with 12.3 ... it is obvious that our solution ... can achieve self-driving"); #7 (when asked directly about Hardware 3 capabilities, Musk acknowledged "[w]e're not 100% sure" Hardware 3 will "achieve the safety level that allows for unsupervised FSD"); #11 (analyst asked Musk "Do you still *feel* that way?" regarding LIDAR, to which Musk answered "Yes" and elaborated on his technical reasoning); #16, 18, 19 (similar).

Plaintiffs also allege opinions regarding the projected timeline for fully autonomous driving are actionable based on FE allegations.[19] But none of these allegations demonstrate that full autonomy was not possible on the projected timeline, let alone that Defendants believed it was not possible. Allegations attributed to FEs 2-8 establish no more than that FSD purportedly sometimes made errors similar to those made by human drivers, which is not inconsistent with Defendants' statements. *Supra* at 9-10. And Plaintiffs' allegation that FE-1 personally considered "redundanc[ies]" to be "essential" (¶ 349) establishes nothing more than differing engineering views regarding the viability of Tesla's approach (*see supra* at 11-12). There is no allegation that any Defendant "shared," "adopted," or "accepted those employees' views" when the statement was made. *Wochos*, 985 F.3d at 1194.

Plaintiffs' allegations regarding later-in-time events—*i.e.*, alleged traffic law violations during the China and Austin launches—are similarly insufficient to demonstrate Defendants did not honestly hold their professed opinions. Even if those later events rendered any earlier statement false—they do not (*see supra* at 9-12)—they have no bearing on Defendants' honest belief in their earlier statements regarding FSD capabilities. *Omnicare*, 575 U.S. at 186 (that a "belief turned out to be wrong" does not make an opinion statement actionable).

Similarly, Plaintiffs allege Musk's April 2023 statement that "***we believe*** [HW3 vehicles] will achieve full autonomy" (#1) is false based on the view of FE-1—who left Tesla a year earlier—that hardware upgrades would be needed. ¶¶ 346-57. FE-1's view is not only irrelevant from a timing perspective, but it is not alleged to have even been shared with any Defendant. *Wochos*, 985 F.3d at 1194. The Complaint alleges, at most, facts "cutting the other way," which

[19] *See* #2 ("it is obvious that our solution with a relatively low-cost inference computer and standard cameras can achieve self-driving"); #3 ("Our solution is a general solution that works anywhere. It would even work on a different earth."); #9, #11, #13, #15 (similar).

is insufficient. *Omnicare*, 575 U.S. at 189.

4. Vague Statements Of Corporate Optimism Are Inactionable

Certain of the Capability Statements[20] are also precisely the kind of "vague[, ] optimistic" "generalizat[ions]" that courts dismiss as inactionable because "investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *Carlton*, 184 F. Supp. 3d at 455. For example, Plaintiffs assert Musk's statement that "the reality of autonomy is upon us" was false or misleading (#8). But this is nothing more than "vague … corporate cheerleading." *CrowdStrike*, 2026 WL 89682, at *13; *see LaMontagne*, 2024 WL 4353010, at *9 (Tesla's "aims and aspirations" and "confidence in the development timeline" were "too vague for an investor to rely on").[21]

## C. The Safety Statement Was Not Materially False

Plaintiffs only allege one statement regarding the safety of FSD was false or misleading: Taneja's remark on the Q1 2025 Earnings Call that "***FSD supervised*** [is] safer than a human driver" (#14), which Plaintiffs allege was false due to purported traffic violations during the China and Austin launches and Tesla's supposed "no-intervention policy" (¶¶ 427-34). But even if "there were safety issues with the technology[, that] does not suggest that it was false or misleading to assert that the technology was safer than regular human driving." *LaMontagne*, 2024 WL 4353010, at *12. Moreover, Taneja's comment expressly related to ***Full Self-Driving (Supervised)***, which Tesla disclosed required a fully attentive human behind the wheel. "[F]airly

[20] Statements # 3, 8, 18.

[21] Similarly, Plaintiffs challenge Musk's statement that Tesla's FSD solution "would even work on a different earth" and that "if you branded a new earth, it would work on new earth." ¶ 405 (#3). But this obvious "hyperbole" is not a representation any reasonable investor would take literally or "view as significant[]." *Milano v. Perot Sys. Corp.*, 2006 WL 929325, at *5 (N.D. Tex. Mar. 31, 2006); *see also In re Splash Tech.*, 2000 WL 1727377, at *16 (N.D. Cal. Sept. 29, 2000) (statement so "exaggerated" that "no reasonable investor would rely on it").

considered, [Taneja] represented that a driver with the technology is safer than a driver without it." *Oakland County*, 2025 WL 3459471, at *1. Plaintiffs "fail to provide 'contemporaneous reports or data' showing that the statement was false or misleading when made"—*i.e.*, that ***Full Self-Driving (Supervised)*** by a human was not safer than a human driver alone. *LaMontagne*, 2024 WL 4353010, at *12.[22]

**D. The Austin Launch Statements Were Not Materially False**

Plaintiffs allege Defendants' statements regarding their plans to begin offering paid, driverless Robotaxi rides in Austin[23]—***plans they carried out***—were somehow misleading.

All but one of the Austin Launch Statements are forward-looking statements regarding plans to release unsupervised FSD in Austin that are protected by the PSLRA Safe Harbor or the Bespeaks Caution Doctrine. *See* Statements #9, 10, 15, 16, 18, 19; *see supra* at 13-16. And Plaintiffs fail to plead that these statements were false when made—let alone that Defendants *actually knew* they were false or *did not honestly believe* them, as required under the Safe Harbor and *Omnicare* respectively. *See supra* at 13-16. That Tesla's Robotaxis ultimately had safety monitors in the passenger seat during the Austin launch in no way demonstrates statements about the launch were false: The drives were still conducted by a driverless Robotaxi operating with Level 4 capabilities. *Supra* at 11. Moreover, Defendants repeatedly emphasized that safety was

---

[22] The Complaint and documents incorporated by reference confirm Taneja's statement was consistent with other information available to the market. *See* Ex. 24 (2022 Tesla Impact Report) at 77 (FSD Beta crash rate at .31 per 1 million miles, vs. 1.53 per 1 million miles U.S. average); ¶ 286 (v13 software update in Oct. 2024); Ex. 8 (May 5, 2025 Piper Sandler) (reporting "2x" miles to disengagement jump "between v12 and v13" and "clear[]" and "obvious progress") (quoted in ¶ 326); Ex. 9 (June 11, 2025 Guggenheim) at 1 (noting FSD (Supervised) as 54% safer than human drivers). Any methodological criticisms of that data (¶¶ 101-06) are not allegations of falsity.

[23] Statements #9, 10, 15, 16, 18, 19, 21.

the top priority,[24] and the Complaint itself details regulatory developments that may have prompted changes to Tesla's plans. *See* ¶ 395 (noting outreach from lawmakers following enactment of "new state law" requesting Tesla "delay" the launch); ¶ 454 (detailing ongoing NHTSA scrutiny of Austin launch, including questions Tesla was "required to answer by June 19[, 2025]"). Plaintiffs thus have failed to identify a single statement that was materially misleading.

The sole non-forward-looking Austin Launch Statement is Musk's June 22, 2025 post on X: "Super congratulations to the @Tesla_AI software & chip design teams on a successful @Robotaxi launch!" (#21). A congratulatory post is "precisely the sort of generalized positive characterization that is not actionable under the securities laws." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003).[25] Regardless, Musk's post is plainly one of his opinion (shared by analysts, *see* ¶ 456), which Plaintiffs fall far short of pleading he did not honestly hold.

## II. PLAINTIFFS DO NOT PLEAD A STRONG INFERENCE OF SCIENTER

Plaintiffs must plead "specific allegations that [each Defendant] knew of the falsity of the [alleged misstatements] at the time they were made or were severely reckless with respect to the statements' truth." *Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 985 (5th Cir. 2019). It is not enough to allege facts from which an inference of scienter is "reasonable" or "permissible." *Tellabs*, 551 U.S. at 324. Instead, Plaintiffs must "plead with particularity facts that give rise to a strong [] inference" of scienter, *i.e.*, one that is "cogent and compelling." *Id.* at 323-24. The inference must be "as strong as [any] opposing inference of nonfraudulent intent."

---

[24] *See* ¶¶ 417-19 ("[W]e're … putting our toe in the water gently at first … we just want to be cautious … with safety of the general public and those in the car as our top priority."); Ex. 25 (CNBC, May 20, 2025) at 3 (Musk: "We want to deliberately take it slow.") (quoted at ¶ 437).

[25] Statement # 9—"We feel *confident* in being able to do an initial launch of unsupervised, no one in the car, Full Self Driving in Austin in June"—is also inactionable corporate optimism. *See, e.g.*, *Hopson v. MetroPCS Commc'ns, Inc.*, 2011 WL 1119727, at *21 (N.D. Tex. Mar. 25, 2011) ("pretty confident" statement was "non-actionable immaterial" corporate optimism).

*CrowdStrike*, 2026 WL 89682, at *25. Moreover, "[w]here, as here, the plaintiff has not alleged a clear motive for the alleged misstatements or omissions, the strength of its circumstantial evidence of scienter must be correspondingly greater." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 644 (5th Cir. 2005). Plaintiffs' allegations fall far short.

**A. The Allegations Regarding Musk's Pay Package Undermine Scienter**

Plaintiffs do not allege any plausible—let alone cogent and compelling—motive theory. Defendants are not alleged to have sold a *single share* of Tesla stock during the Class Period. *See In re Cornell Companies, Inc. Sec. Litig.*, 2005 WL 8165685, at *17 (S.D. Tex. Mar. 31, 2005) ("[L]ack of trading adds weight to the argument that a strong inference of scienter cannot be found in the pleadings …."). Instead, Plaintiffs allege that Musk was motivated by executive compensation. But "[i]n the Fifth Circuit, allegations that defendants were motivated to commit fraud by … the desire for enhanced incentive compensation … are—without more—insufficient to support an inference of scienter." *CrowdStrike*, 2026 WL 89682, at *18. Plaintiffs' allegations concerning Musk's 2025 Performance Award (Ex. 26, the "Award")—which was ratified by shareholders ***after the Class Period*** (¶ 521)—do not provide more. To the contrary, the Award undermines Plaintiffs' scienter theory, as it was tied to "actual [] progress"—sustained performance and verifiable milestones—rather than hopeful "representations" about FSD progress. *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1346 (10th Cir. 2012).

Pursuant to the Award, Musk received no salary, and his sole compensation was tied to achievement of tranches of market capitalization and operational milestones. *See* Ex. 26. The Award's tranches of market capitalization-related milestones began at approximately double Tesla's market capitalization, increasing to roughly eight times its market capitalization during the Class Period. *See* ¶¶ 496-99; Ex. 26 at 2. Eight of the twelve operational milestones are based on Adjusted EBITDA (ranging from $50 billion to $400 billion), and the remaining four are triggered

by the following specifically defined events: (1) 1 million Robotaxis in commercial operation; (2) delivery of 20 million Tesla vehicles; (3) 10 million active FSD subscriptions; and (4) 1 million Optimus humanoid robots (or "Bots") delivered. *See* Ex. 26 at 3; ¶¶ 503-05.

The motive Plaintiffs allege—*i.e.*, "falsification of FSD progress" to trigger Operational Milestones (¶ 501)—has no basis in reality. Plaintiffs' speculation that Musk intends to count vehicles equipped with FSD (Supervised) towards the "1 million Robotaxis in commercial operation" milestone is irreconcilable with the Award defining "Robotaxi" to only encompass vehicles "offer[ing] transportation services ***without a human driver in the vehicle***" (¶ 503). Plaintiffs' sole issue with the remaining Operational Milestones appears to be that they are not premised *entirely* on achievement of unsupervised FSD goals. *See* ¶¶ 502, 504, 506. But tethering Musk's incentive compensation to the number of vehicles Tesla sells is normal practice—not a suspicious or unique motive. *See Abrams*, 292 F.3d at 434 ("Incentive compensation can hardly be the basis on which an allegation of fraud is predicated."). Plaintiffs' theory that Musk fraudulently concealed issues with FSD (¶ 490)—despite knowing "those issues would inevitably come to light"—in order to secure a package triggered only by explicitly-defined progress on FSD and other milestones simply "does not make a whole lot of sense." *In re Intel Corp. Sec. Litig.*, 2023 WL 2767779, at *25 (N.D. Cal. Mar. 31, 2023).[26]

### B. Plaintiffs Fail To Plead Knowledge Of Falsity Or Deliberate Recklessness

Because Plaintiffs fail to plead motive, "the strength of the[ir] circumstantial evidence of

[26] Plaintiffs separately argue that Musk was motivated by a desire to secure re-ratification of his 2018 performance award, which a Delaware trial court rescinded in January 2024 before it was again ratified by a majority of Tesla shareholders in June 2024. ¶¶ 492, 513-15. But alleged "desire to protect [one's] incentive compensation" is insufficient to plead motive. *Abrams*, 292 F.3d at 432, 435. And this motive is inapplicable to all but one of the alleged misstatements (#2), as the other twenty statements either preceded the Delaware court's January 2024 order or were made after re-ratification of his 2018 performance award.

scienter must be correspondingly greater." *CrowdStrike*, 2026 WL 89682, at *18. Plaintiffs fall far short of "overcom[ing]" that "even higher bar." *Id.* Indeed, because the vast majority of the alleged misstatements were forward-looking (*see supra* at 13-16), Plaintiffs must allege those statements were made with ***actual knowledge*** that they were false; recklessness does not suffice. *See Southland*, 365 F.3d at 371-72; *In re Dell Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 912 (W.D. Tex. 2008). But Plaintiffs fail to allege even recklessness—let alone any actual knowledge of falsity.

1. Musk's "Own Words" Cannot Demonstrate Scienter

Plaintiffs allege Musk's statements demonstrate he possessed "detailed technical knowledge" of FSD technology. ¶ 541. These allegations fall far short of the PSLRA's pleading standard. If such an approach sufficed, scienter would be a foregone conclusion in every case. The PSLRA requires more. *See, e.g.*, *Reckstin Fam. Tr. v. C3.ai, Inc.*, 718 F. Supp. 3d 949, 984 (N.D. Cal. 2024) (defendant's "repeated public remarks" regarding the size of a salesforce were not "indications that he was knowingly misrepresenting the size" of the salesforce); *see also Abrams*, 292 F.3d at 432 (alleging "defendants must have been aware of the misstatement based on their positions" is insufficient). Moreover, the statements Plaintiffs single out—acknowledging the possibility that HW3 might not achieve the safety level allowing for unsupervised FSD (¶¶ 542-43)—undermine any inference of scienter by confirming the non-culpable inference that Defendants were genuinely optimistic and warned the public of associated risks. *See infra* at 26-27; *see also In re FVC.COM Sec. Litig.*, 32 F. App'x 338, 341 (9th Cir. 2002) ("[T]he inference that the plaintiffs would have us draw is that, because the defendants admit that they knew something later and the 'something' is important, they must have known it earlier. That kind of bare inference by hindsight is not permitted under the PSLRA."); *Owens*, 789 F.3d at 545 (similar).

2. Tesla's Representations To Regulators Do Not Support Scienter

Straining to allege Defendants knew Tesla was not close to releasing Level 4-5 autonomy, Plaintiffs point to a news article quoting an April 16, 2025 email from Tesla to a California regulator that the "FSD system it was using in California [R]obotaxi tests … '[wa]s an SAE Level 2 system.'" ¶ 538. This in no way shows that Tesla was not developing Level 4+ autonomy—indeed, the Austin Robotaxi launch in June 2025 was a release of Level 4 features, by Plaintiffs' own allegations—and merely describes particularities of ongoing testing in California under that state's regulatory framework, as Tesla disclosed and the article confirms.[27] *Cf. LaMontagne*, 2024 WL 4353010 at *14 (statements about one feature of FSD did not apply across all features).

3. The Former Employee Allegations Do Not Support Scienter

The Complaint's FE allegations are "not specific enough" to plead that "Defendants [] knew or were severely reckless in not knowing that [the alleged misstatements] were false or misleading." *CrowdStrike*, 2026 WL 89682 at *19. Not one of the FEs alleges a single meeting, document, or piece of data that any Defendant received informing them that their public statements were false. *Abrams*, 292 F.3d at 432 ("The plaintiffs point to no specific internal or external report available at the time of the alleged misstatements that would contradict them."); *Tran v. XBiotech Inc.*, 2016 WL 5408382, at *9 (W.D. Tex. Sep. 23, 2016) (similar).

As an initial matter, FE-1 left Tesla in 2022—a year before the Class Period began. *In re Dell Inc.*, 591 F. Supp. 2d at 895–96 ("Information from [] confidential sources could hardly be probative of [] scienter concerning matters that happened when they were not employed …."). And allegations attributed to FEs 2-8 allege at most that FSD sometimes made similar errors to a

[27] The article noted that Tesla's "notice to the California regulator [] might not be 'a good indication of what reality is in terms of capability" "[b]ecause Tesla doesn't have the permits needed by California regulators to test a Level 3 system." Ex. 27 (Fortune, May 26, 2025) at 7.

human driver (¶¶ 358-77)—which is not inconsistent with Tesla's statements and is expected for developing, cutting-edge technology. *Supra* at 10-11, 16-18.

In any event, Plaintiffs fail to allege that any FEs in fact informed any Defendant of their concerns, and even if they had, the Complaint is devoid of any particularized allegation that any Defendant "shared," "adopted," or "accepted those employees' views that the goal [of FSD] was impossible." *Wochos*, 985 F.3d at 1194; *see also LaMontagne*, 2024 WL 4353010, at *14 (same). Further, general allegations that "the issues with Tesla's autonomous driving technology were well known within Tesla" (¶ 522) are not "'particularized allegations' showing that Musk knew that Tesla could not achieve its goals in the timeline it projected." *LaMontagne*, 2024 WL 4353010, at *14 (rejecting FE allegations that "everyone" knew of FSD problems as insufficient).

4. <u>NHTSA Investigation Allegations Undermine Scienter</u>

Plaintiffs' allegations (¶¶ 532-37) regarding NHTSA scrutiny of FSD do not support any inference of scienter. As to the December 13, 2023 Autosteer recall (¶ 535), it was publicly disclosed, and Tesla warned of the potential for recalls (*supra* at 7). Moreover, Autosteer was an "Autopilot feature" (¶ 57) that came standard on all Tesla vehicles—rather than a feature included in an FSD package—and that "recall" was merely a software update the same month (¶ 174), illustrating Defendants had reason for optimism due to continuing improvements. Likewise, Plaintiffs point to NHTSA opening an investigation into FSD's performance in reduced visibility conditions in October 2024, which covered 2.4 million vehicles and "identified four crashes in reduced visibility." ¶ 536. But they fail to plead why knowing about four crashes out of 2.4 million vehicles would support an inference of scienter, rather than undermining it, and ignore evidence of improvement in low visibility. *See* Ex. 8 at 1 ("Progress is especially obvious … in bad weather (even snow).") (quoted in ¶ 326).

None of the post-Class Period events Plaintiffs highlight—continued NHTSA

investigations and related media coverage—support an inference of scienter. Plaintiffs do not identify any statements rendered misleading by the investigations, which are at best "allegations of fraud by hindsight." *Owens*, 789 F.3d at 545; *see Southland*, 365 F.3d at 383 (similar).

5. Tesla Files Allegations Undermine Scienter

Plaintiffs also point to the so-called "Tesla Files" (¶¶ 378-80; 528-31). But these documents all pre-date the Class Period by years (*supra* at 9 n.7). Moreover, Plaintiffs fail to offer any particularized allegation that any of the Defendants were aware of these documents. And even if alleged pre-2023 safety issues could establish a strong inference of scienter (they cannot), the rate of accidents Plaintiffs allege the Files reflect in no way suggest FSD (Supervised) was not safer than a human driver alone, as would be necessary to even suggest any statement was false.[28]

6. Plaintiffs Cannot Rely On The Core Operations Doctrine

Plaintiffs fail to plead scienter through the core operations doctrine, which, regardless, is a "rare" exception typically applied in cases involving a small-scale company's "single product" and is thus inapplicable here. *Owens*, 789 F.3d at 539. Tesla is a massive company with over 100,000 employees worldwide and multiple lines of business, including automotive manufacturing, energy generation and storage, artificial intelligence, and humanoid robots. *See Neiman v. Bulmahn*, 854 F.3d 741, 750 (5th Cir. 2017) (60 employees too large to support exception); ¶ 491 (alleging "Musk was acutely aware that Tesla's *core automotive business* was facing headwinds"). This is not one of the rare situations in which a staggeringly obvious fact, such as a large loss, would have indisputably been known to senior executives. Rather, this is a highly complex state-of-the-art

[28] Plaintiffs allege "***more than 1,000 crashes*** are documented" across the "***roughly 2.6 million vehicles with Autopilot***." ¶¶ 380, 528. But the Federal Highway Administration reports that "[o]n average, there are over ***6,035,000 vehicle crashes each year***," across around 286 million automobiles in operation. Ex. 28 (Fed. Hwy. Admin. Statistics) at 2. Thus, by Plaintiffs' own admission, Tesla vehicles with Autopilot crash substantially less often than the national average, further undermining the Complaint's allegations of scienter.

technology being developed daily. *See Ginsberg Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570, 604 (N.D. Tex. 2021) (rejecting core operations where contrary fact would not "have been readily apparent"); *CrowdStrike*, 2026 WL 89682, at *20 n.29 (rejecting core operations as to allegations regarding sensors and faulty software); *Intel*, 2023 WL 2767779, at *24 (rejecting allegation that "Intel's 7nm [semiconductor] development was of great importance to the company and to investors" as insufficient to support core operations).

### C. The More Compelling Inference Is Genuine Optimism

Even if Plaintiffs' allegations warranted *any* inference of scienter—and they do not—it would not be as "compelling" as the opposing, non-culpable inference from the facts alleged: Defendants were genuinely optimistic regarding development of FSD and expressed that optimism to investors, alongside extensive disclosures of associated risks. *See Tellabs*, 551 U.S. at 323-24.

Disclosures and analyst reports throughout the Class Period documented progress on Tesla's ground-breaking Vision-Only approach to FSD, which underscores the reason for Defendants' optimism. Tesla invested billions in the Cortex training cluster (¶¶ 239, 244), made demonstrable progress with each software version (¶¶ 286-89; Ex. 8 at 1), achieved a 100x improvement in miles between critical interventions (¶¶ 295-96), and achieved "54% safer than a human" for Full Self-Driving (Supervised) prior to the Austin launch (Ex. 9 at 21).

Notwithstanding this dramatic progress, prior to and throughout the Class Period, Defendants continually cautioned the market regarding FSD and updated investors as its expectations changed. *See supra* at 5-9. For example, Plaintiffs claim Defendants sought to mislead investors regarding HW3's ability to achieve full autonomy, but Defendants continually cautioned investors of the risk it would not do so and then expressly updated them when concerns regarding HW3's capabilities became clear. *Supra* at 4, 7-9. Plaintiffs also allege Defendants concealed safety risks and the potential for traffic violations, but Defendants repeatedly disclosed

both, including specific warnings regarding challenges with both the China and Austin launch. *Supra* at 7. This is not the stuff of securities fraud. *See, e.g.*, *CrowdStrike,* 2026 WL 89682, at *25 n.36 ("[D]isclosure of risks weighs against scienter."); *Owens*, 789 F.3d at 541 ("[D]isclosure of the 'red flags' and candidness about [] uncertainty … neutralize any scienter inference ..."); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1165 (C.D. Cal. 2007) (similar).

Moreover, Plaintiffs' allegations do not establish why Defendants would have sought to misrepresent progress in developing FSD capabilities, despite purportedly knowing of such "issues [that] would inevitably come to light" during the two self-driving launches Plaintiffs point to as having revealed the truth. *Intel*, 2023 WL 2767779, at *25. Plaintiffs' scienter theory "makes little sense" where their "theory that Defendants knew that the software was not safe, not capable of what they alleged, and would not be achieved in the projected timeframe would have inevitably been revealed when Defendants missed their development timeline." *LaMontagne*, 2024 WL 4353010, at *16. Plaintiffs fail to allege any "clear … motivation to delay" that "inevitabl[e]" revelation. *Intel*, 2023 WL 2767779, at *25 (rejecting customer exodus theory).

The lack of any stock sale allegations—across a Class Period by end of which Tesla's share price nearly doubled—further confirms the more compelling, non-culpable inference that Defendants were truly and justifiably optimistic about FSD (and continue to be), and so held their stock rather than selling. *See Rosenzweig*, 332 F.3d at 867; *CrowdStrike*, 2026 WL 89682, at *18. Musk abandoning all salary in favor of incentive compensation tied to ambitious, expressly defined milestones likewise confirms this non-culpable inference. *See supra* at 20-22.

## III. PLAINTIFFS DO NOT ADEQUATELY ALLEGE LOSS CAUSATION

The Complaint's loss causation theory fails out of the gate as the alleged corrective disclosures ***are disconnected from the reasons Plaintiffs allege the purported misstatements were false***. *See Catogas v. Cyberonics, Inc.*, 292 F. App'x 311, 314 (5th Cir. 2008). To plead falsity

Plaintiffs rely, for example, on allegations that upgrades to HW3 were required, Tesla's Vision-Only approach supposedly struggled with "phantom-braking" in low-visibility, Tesla used LiDAR-equipped Ground Truth Machines for training, and Tesla's Full Self-Driving (Supervised) technology was SAE Level 2. *See supra* at 10-14. But they do not allege that the revelation of any of those alleged facts caused losses. *See, e.g.*, ¶ 310 (revelation of HW3 "limitations"); ¶ 533 (2022-2024 NHTSA investigations which allegedly "directly apprised of the risks").

Plaintiffs instead rely on two purported corrective events—alleged traffic violations following a February 2025 software update in China (of more limited features than in the U.S.) and during the June 2025 Robotaxi launch in Austin (which, by Plaintiffs' own allegations, was of SAE Level 4 features)—that in no way revealed the falsity of prior statements and were instead, at most, materializations of repeatedly disclosed risks. Such attempts to use the Exchange Act as "broad insurance against market losses" do not properly isolate "those economic losses that misrepresentations actually cause." *Dura Pharms, Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

### A. The China Update Did Not Reveal Any Prior Statements Were False

Plaintiffs claim that a software update in China and associated media coverage on February 24-25, 2025 revealed Tesla's technology "fell materially short of Tesla's repeated assurances about self-driving capability." ¶ 448; *see also* ¶ 422 (alleging China launch revealed the "reality" that FSD "could not adapt to China's bus lanes"). But none of the alleged misstatements preceding February 2025 made any representations as to how well the partial self-driving launch in China would go, and Plaintiffs do not connect the dots between any allegedly misrepresented information and any issues with the China rollout. They do not allege issues with HW3, alleged deficiencies with Tesla's Vision-Only approach, or any other allegedly misrepresented facts caused purported issues during the China rollout. Without that critical connective tissue, Plaintiffs fail to allege loss causation. *See In re Dell*, 591 F. Supp. 2d at 909 (disclosure "fail[s] to reveal the falsity of any of

[defendant]'s prior representations, and therefore do[es] not qualify as a corrective disclosure").

Moreover, when Tesla spoke about the update in China, it cautioned investors, noting "bus lanes in China are one of our biggest challenges in making FSD work … [a]s their bus lanes are very complicated." Ex. 7 at 12 (noting data export "quandary"). The materialization of a disclosed risk cannot plead loss causation. *See Ludlow v. BP, P.L.C.*, 800 F.3d 674, 690 (5th Cir. 2015).

**B. The Austin Launch Did Not Reveal Falsity Of Any Prior Statements And Is Not Plausibly Alleged To Have Caused Share Price Declines**

Plaintiffs' other purported corrective disclosure fares no better. Plaintiffs allege that coverage of the June 22, 2025 Austin Robotaxi Launch revealed Defendants' prior statements about FSD were false, but Plaintiffs do not tie the events of the launch to any of the purported misstatements. Indeed, the Austin launch was of SAE Level 4 features by Plaintiffs' own allegations. *See supra* at 11. And Plaintiffs fail to allege that any purported traffic violations (*e.g.*, going 4 mph over the speed limit or issues pulling over (¶¶ 452-53)) were attributable to *any* of the allegedly omitted information. In any event, alleged issues during the event were at most the materialization of a known risk. *See supra* at 7-9.

Further, the Complaint does not allege a stock decline from the Austin Launch. This is fatal because there was already reporting prior to the Austin Launch that there would be safety monitors in the passenger seats (*see* ¶ 454),[29] and there was also coverage on June 23 of videos of alleged traffic law violations. Indeed, despite what Plaintiffs characterize as negative coverage—including that "the NHTSA was looking into Robotaxi's apparent violations of traffic laws during the June 22, 2025 event" (¶ 452)—***Tesla's stock price surged by $26.52***, closing at $348.68 on Monday, June 23. Ex. 10 at 3. Despite continued coverage overnight of NHTSA's investigation

[29] *See also* Ex. 29 (Electrek, June 20, 2025) at 1 ("There's going to be a 'safety monitor' in the front seat."); Ex. 30 (CNBC, June 20, 2025); Ex. 31 (Reuters, June 20, 2025); Ex. 9 (June 11, 2025 Guggenheim) at 1 (detailing further disclosures from Musk re limited scope of launch).

of potential traffic law violations (¶¶ 453-54)—Tesla's stock ***opened even higher on Tuesday, June 24***—at $356.16. *See* Ex. 10 at 3.[30] And, notably, Plaintiffs do not point to ***any new, corrective information*** in the continued coverage on June 24 and June 25 preceding the alleged stock decline. *See Catogas*, 292 F. App'x at 314. It is thus unsurprising that the Complaint itself points to more plausible explanations for the June 24 and 25 stock price declines:

- **June 24, 2025 Waymo-Uber Atlanta launch**: On June 24, 2025 it was announced that Waymo and Uber "launched service in Atlanta." ¶ 82. News coverage emphasized competition between Tesla and Uber[31] and commentators attributed Tesla's share price decline on June 24 to the Waymo-Uber news. *See* Ex. 32 (Investopedia, June 24, 2025).
- **June 25, 2025 negative news regarding purportedly struggling "core automotive business"** (¶¶ 269, 491): Tesla's stock price "fell 4.4% in the [June 25, 2025] morning session ***after reports showed the company's sales in the European Union plunged*** for the fifth consecutive month in May 2025." Ex. 35 (Yahoo! Finance, June 25, 2025); *see also* Ex. 36 (CNBC, June 25, 2025) at 2 (similar).

Given these "more plausible reason[s]" for the "drop in [] stock price," the Court need not "indulge unwarranted inferences in order to save [the] complaint from dismissal." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063-65 (9th Cir. 2008); *In re Dell*, 591 F. Supp. 2d at 907 (requiring allegations that "reve[lation]" of the relevant truth—not "other unrelated negative statements"—"more probabl[y] than not … cause[d] a significant amount of the decline").

## IV. PLAINTIFFS FAIL TO PLEAD CONTROL PERSON LIABILITY

Because Plaintiffs fail to allege a violation of Section 10(b), their Section 20(a) claim fails. *See Southland*, 365 F.3d at 383. And even if Plaintiffs did plead a primary violation, all alleged misstatements are oral statements over which the other individuals had no control. *See id.* at 384.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Complaint should be dismissed with prejudice.

---

[30] In any event, the announcement that a regulator is "looking into" (¶ 452) an event is not a corrective disclosure. *See In re Dell*, 591 F. Supp. 2d at 909-10.

[31] *E.g.*, Ex. 33 (CNBC, June 24, 2025); Ex. 34 (Fortune, June 24, 2025).

Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Dated: April 20, 2026

*/s/ John F. Bash*

John F. Bash
300 West 6th St., Suite 2010
Austin, TX 78701
Telephone: (737) 667-6110
Fax: (737) 667-6100
johnbash@quinnemanuel.com

Alex Spiro (admitted *pro hac vice*)
Jesse Bernstein (admitted *pro hac vice*)
Leigha Empson (admitted *pro hac vice*)
Sasha Boutilier (*pro hac vice* pending)
295 Fifth Avenue
New York, NY 10016
Telephone: (212) 849-7000
Fax: (212) 849-7100
alexspiro@quinnemanuel.com
jessebernstein@quinnemanuel.com
leighaempson@quinnemanuel.com
sashaboutilier@quinnemanuel.com

*Counsel for Defendants*